# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CENTRAL MUTUAL INSURANCE
COMPANY a/s/o ETHAN AND
ASHLEY COLCLASURE,

    Plaintiff,

v.

FERGUSON ENTERPRISES, LLC, *et al.*,

    Defendants.

    )
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:23-cv-00661
Judge Aleta A. Trauger

## <u>MEMORANDUM</u>

Before the court is the defendants' Motion to Exclude Testimony of Plaintiff's Retained Experts (Doc. No. 53), supported by a Memorandum of Law (Doc. No. 54). The plaintiff opposes the motion (Doc. No. 56), and the defendant has filed a Reply (Doc. No. 58) in further support thereof. For the reasons set forth herein, the motion will be granted.

## I.    BACKGROUND

### A.    The Fire

This case arises from a fire that occurred on April 13, 2020 at the Nashville home of Ethan and Ashley Colclasure. The Colclasures' home, at the time, was insured by a policy ("Policy") issued by plaintiff Central Mutual Insurance Company ("CMIC"). Pursuant to the terms of the Policy, CMIC paid a substantial sum to the Colclasures to reimburse them for the costs incurred in repairing the damage caused by the fire. CMIC now brings this action as subrogee of the Colclasures against defendants Ferguson Enterprises, LLC, Ferguson U.S. Holdings, Inc., Ferguson-Showroom No. 907, and Ferguson Enterprises, LLC No. 20 (referred to collectively

herein, in the singular, as "Ferguson" or "the defendant"), to recover the sums it paid to its insureds. (*See generally*, Compl., Doc. No. 1.)

The Colclasures' home was built in 2019 by Colclasure Company, a residential construction company owned by Ethan Colclasure. As part of the construction, Colclasure Company contracted with Ferguson to assist with the project, specifically by supplying and installing an outdoor gas grill, the Superior Equipment Solutions d/b/a Artisan Grills Model No. ARTP-36 (the "grill"), in the outdoor patio/lanai area of the house. The Colclasures used the grill without incident for several months after moving into the house. In April 2020, however, Ethan Colclasure used the grill to sear steaks. There is no dispute now that Ethan Colclasure neglected to turn the grill off, leaving all three burners set to "high" for approximately twenty hours—with the hood vent turned off and the garage door opening to the lanai down, so that the area was entirely enclosed—before the combustible wall behind the grill ignited, causing the fire that led to catastrophic damage to the home.

The plaintiff's theory of recovery against Ferguson is that the fire was directly caused by "Ferguson's failure to properly install the barbeque grill, its insulated jacket/shroud, and related components . . . with sufficient and adequate clearances to combustibles pursuant to the manufacturer's instructions and warnings." (Compl. ¶ 40.) CMIC asserts claims against Ferguson for breach of contract, negligence, and breach of express and implied warranties. (*Id.* at 18–25.)

### B.     The Plaintiff's Expert Disclosures

In accordance with the extended deadlines set forth in the Order modifying discovery deadlines (*see* Doc. No. 42), the plaintiff served its Rule 26(a)(2) expert disclosure on Ferguson on September 19, 2025, identifying as retained experts both Jerry R. Carter, a fire scene origin and cause investigator, and Randy M. Grundy, an executive general adjuster and claims management professional and expert in evaluating catastrophic residential property damage claims. (Doc. No.

55-20 at 2, 4.) Carter's signed expert report setting forth his opinions is attached as an exhibit to the disclosure. (*Id.* at 9–13.) Attached to Carter's report are some of the exhibits on which he relied to form his opinions, an appendix detailing all of the items he reviewed in preparing his report, his Curriculum Vitae ("CV"), a list of cases in which he gave a deposition or testified as an expert, and a document showing his company's billing rates and fee schedule for providing services as a fire analysis expert. (*Id.* at 14–98.)

Also attached to the plaintiff's expert disclosure is Grundy's CV. (*Id.* at 99–101.) The disclosure does not include an expert report drafted and signed by Grundy, a list of cases in which he has been retained as an expert, or a fee schedule.

### C. Carter's Expert Report and Testimony

Carter begins his Report by describing the Colclasures' reports of the discovery of the fire and their response to it and by explaining where the fire began in relation to the grill and the direction in which it spread. That the fire started at the wall behind the grill is not disputed. Carter then opines that "[t]he fire was caused by the improper installation of the [grill]." (Doc. No. 55-20 at 12.) More specifically, he asserts that the grill and its insulated "jacket"

> were not installed in accordance with manufacturer's instructions as the assembly was positioned only 2.5" from the combustible wall assembly and is required to be installed 5.75" from combustible components (attachment 3). This improper installation did allow for heat from the operating grill assembly, by conduction, convection and radiation, to be transmitted to the combustible wall structural components thus resulting in their degradation and subsequent ignition over the more than 20 hours that the grill was operating providing the necessary heat for ignition.

(*Id.*)

He provides, in summary fashion, "further opinions related to the causation of the fire," as follows:

> 1. Information provided by the insureds, Ethan and Ashley Colclasure, from personal interviews as well as deposition testimony.

2. Information provided by the instruction manual ( Care and Use Manual ) for the Artisan Professional 36-Inch 3-Burner Built-In Natural Gas Grill including the clearances section "To Combustible Construction" located on page 6 of the manual, the Artisan Insulated Jackets Assembly Instructions and the Artisan Cutout dimensions guide indicating the set back for the grill assembly with the insulated jacket installed to be 5.75" from combustible contents and structural components.

3. Had the grill and jacket assembly been properly installed, with the required 5.75" clearance to combustible components, the fire would not have occurred.

4. Even with the grill operating for more than 20 hours, had it been properly installed, the fire would not have occurred.

5. Information provided by Dr. Thomas Eaton of Eaton Engineering, together with this investigator's personal inspection indicating no evidence of a failure of the home's electrical system or natural gas systems provided to the grill or hood vent assembly or other appliances, receptacles or gas outlets located at the lanai area.

6. The elimination of the fire's inception elsewhere within the home or more specifically the lanai area, the adjacent hallway or the subfloor area above the lanai.

7. The elimination of the fire's inception as a result of a failure of the hood vent assembly or a failure of the Artisan grill.

8. Additional information provided by Reliance Heating and Air who installed the ductwork for the hood vent system and Dycus Electric who performed the electrical work within the home.

(*Id.* at 12–13.) Obviously, most of theses enumerated "opinions" are not opinions at all. During his deposition, Carter confirmed that Numbers 1, 2, 5, 6, 7, and 8 are not opinions but information that formed the basis for his opinions. (*See* Doc. No. 55-14, Carter Dep. 86–90.)

Numbers 3 and 4 are opinions that supplement his primary opinion, which, as set forth above, is that the grill and insulated jacket "were not installed in accordance with manufacturer's instructions" and that the improper installation caused the fire. (Doc. No. 55-20 at 12.) His report contains no additional information regarding the formation of these opinions.

Ferguson's attorney questioned Carter about his opinions and bases for the opinions at length during his deposition. Specifically regarding his opinion that "[t]he Artisan grill and insulated jacket were not installed in accordance with manufacturer's instructions as the assembly

was positioned only 2.5 inches from the combustible wall assembly and is required to be installed 5.75 from combustible components," Carter confirmed that the basis for this opinion was Exhibit A47 to his report, located at Doc. No. 55-20 at 55. (Doc. No. 55-14, Carter Dep. 68, 70–71.) This figure shows a basic drawing of the cutout dimensions and a chart specifying the necessary setbacks. It looks (in relevant part) like this:



| MODEL | CUTOUT DIMENSIONS | | | NOTCH | SETBACKS | | POWER ❶ | GAS LINE |
|---|---|---|---|---|---|---|---|---|
| | W | D | H | N | S1(MIN.) | S2 | AMPS | |
| AAEP-26 | 24-1/2" | 19-3/4" | 9-1/2" | 7/8" | 5-3/4" | ~ | | ❸ |
| ARTP-32 / AAEP-32 | 30-1/2" | 19-3/4" | 9-1/2" | 7/8" | 5-3/4" | ~ | 0.71 ❷ | ❸ |
| ARTP-36 | 34-1/2" | 19-3/4" | 9-1/2" | 7/8" | 5-3/4" | ~ | 0.71 ❷ | ❸ |
| ARTIJ-26 | 27-1/4" | 23-5/8" | 10-1/4" | 7/8" | 1-5/8" | ~ | | ❹ |
| ARTIJ-32 | 33-1/4" | 23-5/8" | 10-1/4" | 7/8" | 1-5/8" | ~ | ❹ | ❹ |
| ARTIJ-36 | 37-1/4" | 23-5/8" | 10-1/4" | 7/8" | 1-5/8" | ~ | ❹ | ❹ |
| ART-SB1 | 11" | 15" | ~ | ~ | 1-1/2" | ~ | | ❺ |
| ARTP-SDL /SDR | 13-7/8" | ~ | 18-1/2" | ~ | ~ | ~ | | |
| ARTP-DD | 27-1/4" | ~ | 18-1/2" | ~ | ~ | ~ | | |
| ARTP-DDC | 29-3/8" | 18-5/8" | 18-1/2" | ~ | ~ | ~ | | |
| ARTP-2DR | 14-5/8" | 18-5/8" | 12-1/2" | ~ | ~ | ~ | | |
| ARTP-TC | 12-1/2" | 18-1/2" | 26-1/2" | ~ | ~ | ~ | | |
| ARTP-PWC | 6-1/4" | 8-1/4" | ~ | ~ | ~ | 4-5/8" | | |

(Doc. No. 55-20 at 55.)

The grill in question is the ARTP-36 model. The insulating jacket installed around it was the ARTIJ-36. As set forth in the chart below the graphic, the setback dimensions ("S1") for these

two models were a minimum ("MIN.") setback of 5-3/4 inches for the ARTP-36 and a minimum setback for the insulating jacket, ARTIJ-36, of 1-5/8 inches. (*See id.*, *supra*.) As Carter explained, Exhibit A 47 shows a "drawing of the cabinet where you would mount the grill assembly on that. And the cutout dimensions . . . for the ARTP 36 require . . . an S1 minimum, . . . which is 5 3/4 inches for that." (Carter Dep. 70.) And he reconfirmed that Exhibit A 47 is the "source of [his] statement that the . . . manufacturer requires a 5 3/4 inch distance from the combustible wall to the grill." (*Id.* at 71.) He did not explain why he reached this opinion even though the chart appears to require a setback of only 1-5/8 inches for the insulated jacket.

Later in his deposition, counsel circled back and asked Carter to confirm that she had correctly understood his testimony. Carter confirmed that, even though the grill manual "never says that," he interpreted the manual to mean that the use of an insulating jacket took the clearance requirement for the distance between the grill and a combustible surface from 12 inches to 5.75 inches. (*Id.* at 81–83.)

Defense counsel also asked Carter to explain in layman's terms his statement that the improper installation of the grill "allow[ed] for heat from the operating grill assembly by conduction, convection, and radiation to be transmitted to the combustible wall structural components, thus resulting in their degradation and subsequent ignition over the more than 20 hours that the grill was operating providing the necessary heat for ignition." (*Id.* at 71–72.) Carter explained that heat is spread by conduction (transmission along an item's surface), convection (transmission by air currents), and radiation (like sunshine) and that with the proximity of the grill to the combustible wall behind it, "not in accordance with the manufacturer's instructions," the "amount of heat transmitted"—primarily by convection and radiation—"is going to allow that wall to heat up and begin to degrade and eventually reach its ignition point." (*Id.* at 72–73.) However,

Carter did not do any testing, so he did not know what the temperature of the grill left on high for more than twenty hours would have been. He knew only that it "would be hot." (*Id.* at 73.)

His second opinion (No. 3 on his list of additional opinions) is that the fire would not have occurred if "the grill and jacket [had] been properly installed, with the required 5.75" clearance to combustible components." (*Id.* at 73; *see also* Doc. No. 55-20 at 12.) Asked to explain the basis for that opinion, Carter stated that it, again, had to do with "convection and radiation." (Carter Dep. 74.) He continued:

> Distance is . . . what you're in favor of here. The actual manual itself gives you a clearance to combustibles of 12 inches, but my interpretation of it is that when you have the insulated jacket, you're down to 5.75 inches, but you've still got the ability to radiate the heat or to – through the convection of the heat from the – the grill itself, as well as the radiation of the heat and distance is what is your friend here.
>
> The further you are away from the combustible material, the combustible wall, you're not going to have a fire if it's within . . . the distances that are prescribed on that.
>
> So that's . . . what we're talking about here. If it had been installed with the proper clearances, you wouldn't have had a fire. . . . [T]he grill could have just continued to burn.

(*Id.* at 74.) Asked if he meant that the grill could have "burned in perpetuity in the high position without igniting a fire" if it had been positioned 5.75 inches from the wall," he agreed, "I wouldn't see why it wouldn't." (*Id.* at 75.)

He added:

> I didn't do the testing. I didn't do the engineering or manufacturing on it, but these are the manufacturer's specifications that are set up by the manufacturer.
>
> So the manufacturer has done the testing on it. They've done the engineering on it. So when they provide me with this information on these clearances and setbacks . . . , they're not going to build an appliance that's going to cause something to catch on fire. So, yes, I would say it would be able to run in perpetuity or at least until [it] ran out of gas anyway.

(*Id.*) Asked whether he had "done any further research or look[ed] into testing that the manufacturer" of the grill had done, he confirmed that he had not. (*Id.* at 75, 76.) He explained:

> They have provided the manufacturer's instruction manual which is telling the individual as well as the installer [to] meet these requirements and you will be safe. Even though there are warnings that fires can occur because they're looking for – you know, I mean, you could – you could have an actual food fire or something sitting on top of the grill that could catch fire. So that – it is a hot appliance, but these are the instructions that are provided and with these, if you follow these instructions, you're going to avoid having a fire.

(*Id.* at 76.)

Asked whether he had personally done any testing relating to the opinions in his report, Carter equivocated, and counsel for Ferguson clarified: "If you consider it testing, you tell me about it." (*Id.* at 77.) Carter replied that he "consider[ed] a lot of things testing." (*Id.*) So, for example:

> If a grill is on and operating and you put your hand at different distances from that grill, you can determine the amount of heat. You're going to get to a point where you're going to . . . set your hand on fire or at least you're going to burn yourself. That's testing. That's just cognitive testing . . . on that.

(*Id.*) He confirmed that he has done a lot of such cognitive testing over the years, but he did not indicate that he did any cognitive testing relating to this case. He did not obtain or run any specific tests on an "exemplar grill" of the same model as the grill at issue here (or any other grill). (*Id.* at 83.)

He relayed an anecdote that he apparently believed to be an example of cognitive testing. Approximately ten years ago, when he was employed as a firefighter at the City of Red Bank Fire Department, someone at the fire department left a grill on "at full blast" for a "long time, three or four days," or possibly more, but, because of the "clearance"—the distance between the grill and the noncombustible wall behind it—the paint on the wall was slightly discolored, but it did not burn or flake off. (*Id.* at 77–79.) Leaving the grill on was not an intentional experiment; rather, it

was "purely accidental." (*Id.* at 78.) He did not know the make or manufacturer of the grill, and he did not measure the distance between the grill and the wall behind it. (*Id.* at 79, 160.) He also did not indicate that the grill was in an enclosed space. Carter has also accidentally left his own grill on overnight without incident, but his grill is outdoors on a stand. (*Id.* at 85–86.) He has not personally conducted any testing or experiments where he intentionally left a grill on for a substantial period of time. (*Id.* at 85.)

Aside from the manufacturer's setback requirements as indicated in the manual, Carter could not articulate any additional basis for his opinion that the fire would not have occurred if the required minimum setback had been met. (*See id.* at 83.) Instead, he simply repeated that time and distance—the length of time heat is being generated and the distance between the heat source and the combustible surface—are "most important here." (*Id.*) That is, if "the distance from the back of the heating appliance to the combustible wall . . . is sufficient," meaning, if it had been "5.75 inches" as "outlined in the instructions," "you shouldn't have a fire." (*Id.* at 84.) And again, this opinion was based on the testing he believed the manufacturer to have done. (*Id.*)

His third opinion (No. 4 on his list) was "basically the same": "Even with the grill operating for more than 20 hours, had it been properly installed, the fire would not have occurred." (*Id.*; *see also* Doc. No. 55-20 at 12.) He reconfirmed that this opinion was based on the "distance factor and [his] personal experience from seeing that when the distance factor is increased, a grill can operate for an infinite period of time without setting fire to the combustible surface." (Carter Dep. 84–85.) Because he had measured the back of the grill and insulated jacket assembly as being 2.5 inches from the wall behind it, an additional 3.25 inches distance would have met that requirement. Carter agreed that an additional 3.25 inches was "not a large distance," but he believed that it would have "resulted in a fire not occurring." (*Id.* at 85.)

On examination by plaintiff's counsel, Carter purported to explain how he always uses the "scientific method" when he is investigating a fire and that application of the scientific method generally means that he gathers data, formulates several hypotheses, and then tests those hypotheses. (*Id.* at 109–10.) When he is left with one hypothesis that has not been eliminated by testing or additional information, then you know "you've got the right answer." (*Id.* at 112.) He confirmed that he had analyzed other fires that started by a grill as the "fuel source" igniting a combustible wall, but he could not recall the distance between the grills and the combustible walls in those cases, though the distance (or lack thereof) was "obviously what caused the fire to occur." (*Id.* at 140.) He reiterated that the grill in this case was not installed properly, based on the metrics provided by the manufacturer, and that the improper installation caused the fire. (*Id.* at 156.)

## II.  LEGAL STANDARDS

### A.  Federal Rules 26 and 37

Under Rule 26, in addition to other disclosure obligations, each party "must disclose to the other parties the identity of any witness it may use at trial" to introduce expert evidence under Federal Rule of Evidence 702. Fed. R. Civ. P. 26(a)(2)(A). Unless the court orders otherwise, the disclosure of any witness "retained or specially employed to provide expert testimony" "must be accompanied by a written report," and that report must be "prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). The rule also dictates the contents of the expert's signed report. The report must include:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

*Id.* An expert who is required to provide a report may only be deposed after the report is provided. Fed. R. Civ. P. 26(b)(4)(A).

"If a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Alternatively, this harsh sanction may be lessened "on motion and after giving an opportunity to be heard." *Id.* The Sixth Circuit has repeatedly recognized that this rule "requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 752 (6th Cir. 2016) (quoting *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)). "Additionally, the burden is on the potentially sanctioned party to show harmlessness." *Id.* (citing *Roberts*, 325 F.3d at 782).

**B.     Rule 702 and *Daubert***

Federal Rule of Evidence 702 generally governs the admissibility of expert testimony. Under this rule:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

On a motion to exclude, the party offering an expert's opinion bears the burden of establishing the admissibility of that opinion by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert evidence is both reliable and relevant. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007).

"Parsing the language of the Rule," the Sixth Circuit has concluded that "a proposed expert's opinion is admissible, at the discretion of the trial court," if (1) the proposed witness is "qualified by 'knowledge, skill, experience, training, or education'"; (2) the testimony is "relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue'"; and (3) the testimony is "reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702.)

In determining whether testimony is reliable, the court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). In *Daubert*, the Supreme Court identified a non-exhaustive list of factors that may help courts in assessing the reliability of a proposed expert's opinion, including: (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Id.* at 592–94. The *Daubert* factors "are not dispositive in every case and should be applied only where they are reasonable measures of reliability of expert

testimony." *Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (internal quotation marks and citation omitted). At the same time, "rejection of expert testimony is the exception, rather than the rule." *Scrap Metal Antitrust Litig.*, 527 F.3d at 530. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30. Generally, any issue regarding the credibility or accuracy of admitted expert testimony goes to the weight rather than the admissibility of the evidence, and it can be addressed via cross-examination and the "presentation of contrary evidence" by opposing counsel. *Id.* at 530 (quoting *Daubert*, 509 U.S. at 596). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III.   THE DEFENDANT'S MOTION

### A.      Exclusion of Carter's Testimony

Ferguson argues, first, that Carter's testimony must be excluded because it is neither relevant nor reliable, insofar as his opinions are not based on sufficient facts or data, are not the product of reliable principles and methods, and rely entirely on "anecdotal evidence and improper extrapolation." (Doc. No. 54 at 14.) Alternatively, the defendant contends that Carter's testimony should be excluded under Rule 37(c), based on the plaintiff's failure to comply with Rule 26(a)(2)(B), because the opinions in his expert report are not accompanied by the basis and reasons for each opinion or the facts and data considered in forming each opinion.

Regarding the latter argument, the court observes that Carter's expert report was clearly deficient, insofar as it merely pronounced Carter's conclusions without providing any indication of how he reached them. That failure was harmless, however, because the defendant deposed Carter at length regarding the bases for his opinions. Regardless, because his opinions are

inadequately supported and unreliable, his testimony will be excluded under Rule 702 and *Daubert*.

As set out in detail above, Carter's opinions are that (1) "[t]he Artisan grill and insulated jacket were not installed in accordance with manufacturer's instructions as the assembly was positioned only 2.5 inches from the combustible wall assembly and is required to be installed 5.75 from combustible components"; (2) "[h]ad the grill and jacket assembly been properly installed, with the required 5.75" clearance to combustible components, the fire would not have occurred"; and (3) "[e]ven with the grill operating for more than 20 hours, had it been properly installed, the fire would not have occurred." (Doc. No. 55-20 at 12.) For these opinions to be admissible, they must be "based on sufficient facts or data"; Carter's testimony must be the "product of reliable principles and methods"; and his opinion must "reflect[] a reliable application of the principles and methods to the facts of [this] case." Fed. R. Civ. P. 702(b)–(d).

Here, although Carter claimed that he employs the "scientific method" every time he analyzes a fire and that the scientific method requires him to collect data, formulate hypotheses, and test those hypotheses (Carter Dep. 109–10), the record establishes that he did not test his governing hypothesis. Even assuming for the sake of argument that Carter is correct in interpreting the grill manual as requiring a 5.75-inch clearance between the back of the grill as installed (meaning from the edge of the insulating jack) and the combustible wall behind the grill, and assuming that Carter is correct that the grill was not properly installed, his ultimate opinion is not adequately supported. That is, his opinion that the fire would not have occurred if there had been an additional 3.25 inches between the back of the grill and the wall is not based on sufficient facts and data or reliable principles and methods.

By his own admission, Carter did not perform any testing, cognitive or otherwise, on this or any other grill, to test his hypothesis that ignition of the wall would not have occurred but for the proximity of the grill to the wall. The only support for this hypothesis is the manufacturer's installment setback specifications in Exhibit A 47 and Carter's assumption that the manufacturer tested his hypothesis for him. But he did not confirm with the manufacturer whether that was true. His personal experience and anecdotal evidence show only that free standing outdoor grills far enough away from a combustible surface typically do not start house fires. That experience, with which many of us can relate, says nothing about this particular grill, set on high, in an enclosed room, for more than twenty hours.

It is well established that "[t]he '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Madej v. Maiden*, 951 F.3d 364, 375 (6th Cir. 2020) (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010)). No matter how qualified Carter may be, his subjective belief—supported by nothing more than the grill's setback requirements and his conjecture that the manufacturer must have done some testing to support those requirements—is not sufficiently reliable to be admitted. Carter's opinions amount to no more than unsupported speculation and, as such, are inadmissible. *Accord Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30 ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

Because Carter's opinion that the fire would not have ignited if the grill had been properly installed is not sufficiently reliable, and his opinion that the grill was improperly installed is simply irrelevant. His opinion that the fire started behind the grill is apparently undisputed and not really

the subject of expert testimony. Accordingly, Ferguson's motion to exclude his testimony will be granted in its entirety.

### B. Exclusion of Grundy's Testimony

As set forth above, unless the court orders otherwise,[1] Rule 26(a)(2) requires a party disclosing a retained expert to include with the disclosure a written report "prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). And the expert's report must include elements specified in the rule *Id.* If a party fails to provide the required information for a retained expert, it may not use that witness's testimony as evidence at a trial or on a motion, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The court must consider five factors when assessing substantial justification and harmlessness, including:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 668–69 (6th Cir. 2024)(quoting *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015)).

Ferguson asserts that the plaintiff's disclosure of Grundy as a retained expert did not comply with Rule 26(a) and that the failure is neither harmless nor substantially justified. The defendant points out that, although Grundy was disclosed in the September 19, 2025 disclosure, that disclosure was not accompanied by an expert report, much less an expert report that included all of the items listed in Rule 26(a). In fact, the only document pertaining to Grundy that accompanied the disclosure was his CV. Ferguson argues that, as a result of the nondisclosure, the

---

[1] This court did not order otherwise.

use of any testimony from Grundy at trial would come as a surprise to it, irrespective of the fact that Ferguson is "aware of [Mr. Grundy's] identity and the general areas of his alleged expertise." (Doc. No. 54 at 19 (quoting *RJ Control Consultants*, 100 F.4th at 669).) The defendant contends that its ability to mitigate the surprise is limited, given that the plaintiff did not merely supply a late report—it did not furnish an expert report at all. To the extent Grundy's testimony is not excluded, the defendant would bear the burden and expense of seeking to reopen discovery, even though the failure to satisfy Rule 26 is due to the plaintiff's lack of diligence. Ferguson also points out that the plaintiff has never offered any explanation for the failure to provide an expert report.

In its Response to the motion, CMIC baldly asserts that "Ferguson incorrectly asserts that Grundy failed to provide a report." (Doc. No. 56 at 2.) It adds that Ferguson's position "ignores the fact that Plaintiff produced Grundy's damages reports in discovery and expressly identified those materials in its expert disclosures." (*Id.*) The court presumes that the plaintiff may be referring to the 77,000 pages of documents referenced in the Rule 26 disclosure. (*See* Doc. No. 55-20 at 4 ("Mr. Grundy's anticipated testimony is based on . . . photographs, statements, reports, and documents, including Plaintiff's document productions, Bates Nos. CMIC000001-77255, relating to the fire . . . .").) The plaintiff reiterates this assertion in the body of its Response: "Ferguson asserts that Plaintiff's damages expert, Randy Grundy, failed to provide a report. The record shows otherwise. Plaintiff produced Mr. Grundy's damages material in discovery and expressly identified and referenced those materials in its Expert Disclosure." (*Id.* at 12.) CMIC also asserts that it provided Grundy's CV and "an abundance of information related to his education, training, experience, qualifications, publications, and rates." (*Id.*) Indeed, the plaintiff supplied Grundy's CV that is just over two pages in length and includes a brief "professional summary," his employment history, and a list of his education and certifications, including the states in which he

is licensed as an adjuster. (Doc. No. 55-20 at 99–101.) The plaintiff also asserts that Grundy provided "detailed reports and statements of the loss," again identifying by Bates-numbers the 70,000 pages of documents apparently supplied by the plaintiff during discovery. (*See* Doc. No. 56 at 13.) Finally, CMIC also asserts that Ferguson is at fault here, because it affirmative "chose" not to depose Grundy or to confer with the plaintiff "regarding any perceived deficit with Grundy's damages analysis. (*Id.*)

This Response borders on the ludicrous. It is clear that CMIC did not comply with Rule 26(a) in disclosing Grundy, as it did not supply an expert report, designated as such, authored and signed by the proposed expert, accompanied by the items listed in Rule 26(a)(2)(B). The plaintiff's having supplied more than 70,000 pages of documents to the defendant in discovery is no substitute for compliance with Rule 26(a)(2)(B). CMIC fails to acknowledge that it did not comply with the rule and, accordingly, has made no attempt to argue that its failure to do so was substantially justified. At best, CMIC seems to be asserting that the failure is harmless because Ferguson has all the information it needs and that it could have, but chose not to, depose Grundy. However, as noted above, a retained expert may only be deposed *after* he supplies the required report. Fed. R. Civ. P. 26(b)(4)(A).

The plaintiff has not shown that it complied with Rule 26(a)(2)(B) or that its failure to do so is substantially justified or harmless. This case is now scheduled for trial in less than 90 days. Ferguson's motion to exclude the testimony of the plaintiff's retained expert, Randy Grundy, will be granted under Rule 37(c), based on the plaintiff's complete failure to comply with Rule 26 and failure to show that the failure was harmless or substantially justified.

## IV.   CONCLUSION

For the reasons set forth herein, the defendants' Motion to Exclude Testimony of Plaintiff's Retained Experts (Doc. No. 53) will be granted. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge